**UNITED STATES of America, Plaintiff,**

v.

**Melvin A. SLAWIK et al., Defendants.**

**Crim. A. No. 75–110.**

United States District Court, D. Delaware.

Dec. 16, 1975.

On Motion to Suppress Jan. 29, 1976.

196

W. Laird Stabler, Jr., U. S. Atty., and Alan J. Hoffman, Asst. U. S. Atty., Wilmington, Del., for plaintiff.

Bruce M. Stargatt, Young, Conaway, Stargatt & Taylor, Wilmington, Del., for defendant Slawik.

Richard Allen Paul and Paul M. Lukoff, Paul & Lukoff, Wilmington, Del., for defendant Uffelman.

Carl Schnee and David E. Brand, Schnee & Castle, Wilmington, Del., for defendant Rappa.

Gerald Z. Berkowitz and Robert B. Coonin, Knecht, Greenstein & Berkowitz, Wilmington, Del., for defendant Capano.

### OPINION

LATCHUM, Chief Judge.

On July 31, 1975 the Grand Jury in this district returned a thirteen count indictment charging violations of the federal conspiracy statute, 18 U.S.C. § 371,[1] as well as violations of 18 U.S.C.

---

1. 18 U.S.C. § 371 reads in relevant part as follows:

 "If two or more persons conspire . . . to commit any offense against the United States . . . , and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both."

§ 1952(a)(3) ("Travel Act");[2] 18 U.S.C. § 1503 ("Influencing . . . Witness");[3] 18 U.S.C. § 1510 ("Obstruction of Criminal Investigation");[4] 18 U.S.C § 1622 ("Subornation of Perjury");[5] 18 U.S.C. § 1623 ("False Declarations Before Grand Jury . . .");[6] and 18 U.S.C. § 2 ("Principals").[7] Melvin Slawik is the only defendant charged in each count of the indictment.

All of the defendants have submitted various pretrial motions, concerning which the Court heard oral argument on September 26, 1975. The accusatory framework to which these motions relate is as follows:

Counts 1, 4 and 10 are conspiracy counts under 18 U.S.C. § 371.

Count 1 charges that from May through October 1974 all of the defendants (Slawik, Uffelman, Rappa and Capano) conspired to violate 18 U.S.C. § 1503 by seeking to convince Bayard Austin "corruptly and by bribes, threats, and threatening communications," to plead the Fifth Amendment before a federal grand jury of this district then investigating alleged activities of the defendants. This count also charges that during the same period all of the defendants conspired to violate 18 U.S.C. § 1510 by seeking to convince Austin, through "misrepresentation and intimidation," to refuse to talk or to cooperate with Special Agents of the FBI with regard to his knowledge of the defendants' activi-

**2.** 18 U.S.C. § 1952 reads in relevant part as follows:

"(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—

\* \* \* \* \* \*

(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,
and thereafter performs or attempts to perform any of the acts specified in subparagraph . . . (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.
(b) As used in this section 'unlawful activity' means . . . (2) . . . bribery . . in violation of the laws of the State in which committed . . . ."

**3.** 18 U.S.C. § 1503 reads in relevant part as follows:

"Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any witness, in any court of the United States . . . or corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be fined not more than $5,000 or imprisoned not more than five years, or both."

**4.** 18 U.S.C. § 1510 reads in relevant part as follows:

"(a) Whoever willfully endeavors by means of bribery, misrepresentation, intimidation, or force or threats thereof to obstruct, delay, or prevent the communication

of information relating to a violation of any criminal statute of the United States by any person to a criminal investigator; . . .

\* \* \* \* \* \*

Shall be fined not more than $5,000, or imprisoned not more than five years, or both.
(b) As used in this section, the term 'criminal investigator' means any individual duly authorized by a department, agency, or armed force of the United States to conduct or engage in investigations of or prosecutions for violations of the criminal laws of the United States."

**5.** 18 U.S.C. § 1622 reads as follows:

"Whoever procures another to commit any perjury is guilty of subornation of perjury, and shall be fined not more than $2,000 or imprisoned not more than five years, or both."

**6.** 18 U.S.C. § 1623 reads in relevant part as follows:

"(a) Whoever under oath in any proceeding before or ancillary to any . . . grand jury of the United States knowingly makes any false material declaration or makes or uses any other information, including any book, paper, document, record, recording, or other material, knowing the same to contain any false material declaration, shall be fined not more than $10,000 or imprisoned not more than five years, or both."

**7.** 18 U.S.C. § 2 reads in relevant part as follows:

"(a) Whoever . . . aids, abets, counsels, commands, induces or procures . . commission [of an offense against the United States] is punishable as a principal."

ties. This conspiracy allegedly was fostered and carried out through a trip by Slawik and Capano to Orlando, Florida in May 1974 to meet with Austin; through numerous telephone conversations of the defendants with Austin from September 23 until October 13, 1974; through a second trip to Orlando by Slawik, Uffelman and Capano on October 13, 1974 to meet with Austin; and through a final telephone conversation by Uffelman with Austin on October 23, 1974.

Count 4 charges that from October 9 until October 14, 1974 Slawik and Capano conspired to violate the Travel Act, 18 U.S.C. § 1952, in that on several occasions between October 9 and October 13 they used and caused to be used telephone facilities between Delaware and Florida, and on October 13 and 14 they traveled to Florida and met with Austin with the intent to promote an unlawful activity, viz., the crime of *bribing a witness in an official proceeding* (prohibited by 11 Del.C. § 1261 (Rev.1974)). The purported aim of Slawik and Capano's conspiracy was to convince Austin to plead the Fifth Amendment "when called to testify" before a federal grand jury sitting in this district. This aim was to be accomplished by offering Austin bribes relating to the continuation of financing of a house which Austin had purchased in Orlando, Florida.

Count 10 charges Slawik, Capano and Austin (the latter as an unindicted co-conspirator) with conspiring from December 18, 1972 through December 21, 1972 to violate the Travel Act, 18 U.S.C. § 1952, by using and causing "others" to travel in interstate commerce with the intent to promote the crime of *bribery* (prohibited by 11 Del.C. § 105 and Del. Const. Art. 2, § 22) and by agreeing that after such interstate travel they would promote and cause "others" to promote the crime of *bribery*. Allegedly, on December 18, 1972 the two defendants as well as Austin and Dennis Petrillo flew to Puerto Rico and vacationed there until December 21, all at Petrillo's expense. Moreover, during the airline flight down and in Puerto Rico, Petrillo allegedly dis-

cussed an application for a gypsum by-product disposal permit that Allied Chemical Corporation had pending before the State of Delaware Department of Natural Resources and Environmental Control and before the New Castle County Department of Public Works, and the position of the New Castle County Executive Office regarding that application. As of December 18, 1972 Slawik was newly elected New Castle County Executive, although he had not formally assumed that office, and Petrillo owned the tract of land that the gypsum by-product disposal permit sought by Allied Chemical Corporation would cover.

As for the substantive counts, the indictment contains the following charges:

Count 2 charges that from May through October 1974 all of the defendants (Slawik, Uffelman, Rappa and Capano), aware that Special Agents of the FBI were then investigating possible violations of several federal statutes, unlawfully, willfully and knowingly endeavored by means of intimidation and misrepresentation to obstruct, delay and prevent Austin from communicating relevant information to these Agents. Such acts are alleged to be a violation of 18 U.S.C. § 1510.

Count 3 charges that between May and October 1974 all of the defendants, aware that Austin had received a subpoena from a federal grand jury of this district, willfully, knowingly and corruptly endeavored to obstruct justice in this district, in violation of 18 U.S.C. § 1503, by advising or attempting to persuade Austin by bribes and threats to plead the Fifth Amendment before the grand jury.

Count 5 charges that on or about October 11, 1974, in violation of 18 U.S.C. § 1952(a)(3) and 18 U.S.C. § 2, Slawik used and caused to be used telephone facilities between Delaware and Florida with the intent to promote an unlawful activity, viz., *bribing a witness in an official proceeding* (prohibited by 11 Del.C. § 1261 (Rev.1974)). Allegedly, Slawik sought to convince Austin to plead the Fifth Amendment before a federal

grand jury of this district in return for the continuation of financing of a house that had been purchased by Austin in Orlando, Florida.

Count 6 charges that on or about October 13, 1974, Slawik and Capano, in violation of 18 U.S.C. § 1952(a)(3), traveled from Delaware to Florida with the intent described in Count 5, and while there, attempted to promote a violation of 11 Del.C. § 1261 (Rev.1974).

Count 7 is a perjury charge. Slawik is charged with having violated 18 U.S.C. § 1623 ("False Declarations Before Grand Jury . . .") in that on December 11, 1974 before a federal grand jury of this district, he testified falsely contrary to his oath regarding his conversations with Austin as such conversations bore upon (1) Austin's possible testimony before a federal grand jury of this district, (2) the obstruction of justice arising from attempts to influence Austin's possible testimony before a federal grand jury of this district, (3) attempts to prevent Austin or someone else from communicating with federal criminal investigators, (4) the identity of any person who might benefit from Austin's withholding of information from a federal grand jury or from federal criminal investigators, and (5) the identity and actions of persons who might have conspired to achieve these ends or to violate other federal statutes.

Count 8 is also a perjury charge under 18 U.S.C. § 1623. This count charges that on December 11, 1974 before the same grand jury Slawik testified falsely contrary to his oath regarding his knowledge of other people who may have been "involved with" his conversations with Austin and the extent of that involvement.

Count 9, the last perjury charge under 18 U.S.C. § 1623, charges that at the grand jury session on December 11, 1974 Slawik testified falsely contrary to his oath regarding his knowledge of the financing of Austin's home in Orlando, Florida and regarding his knowledge of other benefits Austin had received as this related to Austin's withholding information from a federal grand jury of this district and from the FBI.

Count 11 is another Travel Act count. In it Slawik is charged with violating 18 U.S.C. § 1952(a)(3) and 18 U.S.C. § 2 on or about December 18, 1972, in that he used and caused to be used a facility in interstate commerce, viz., a regularly scheduled commercial airline, with the intent to promote the crime of *bribery* prohibited by "Title 11, Delaware Code, and Article II, Section 22, Delaware Constitution," and in that thereafter he performed acts promoting the crime of *bribery* by receiving payment for airline, lodging and meal expenses from Petrillo in connection with discussions with Petrillo about Slawik's views as newly elected New Castle County Executive in regard to Allied Chemical Corporation's pending applications for a gypsum by-product disposal permit covering a tract of Delaware land then owned by Petrillo ("Petrillo tract").

Count 12 charges Slawik with a violation of 18 U.S.C. § 1622 ("Subornation of Perjury"). Allegedly, from September 1974 continuing through March 4, 1975 Slawik knowingly and willfully suborned Petrillo to commit perjury before a federal grand jury of this district with the consequence that on March 4, 1975 Petrillo willfully testified falsely that he (Petrillo) had not financed a trip taken by Slawik to Puerto Rico in December 1972 nor had he had any discussions there with Slawik regarding applications for a gypsum by-product disposal permit covering the Petrillo tract and the views of the New Castle County Executive Office pertaining to the applications.

Count 13, the last count of the indictment, charges that Slawik, between September 1974 and March 4, 1975, in violation of 18 U.S.C. § 1503, willfully and knowingly did corruptly endeavor to obstruct justice in the District of Delaware in that Slawik, knowing that Petrillo had received a subpoena to testify before a federal grand jury of this district, urged and attempted to persuade Petrillo to give false testimony.

## I. MOTIONS TO DISMISS.

These motions which have been filed pursuant to Rule 12, F.R.Cr.P. by defendants Slawik and Capano, are treated in the following manner:

A. *Slawik's Motion to Dismiss Counts 4, 5 & 6 for failure of the activities alleged therein to constitute a violation of Delaware law and hence of the Travel Act.*[8]

8. Docket Item 23, par. 2.

 *Capano's Motion to Dismiss Counts 4 & 6 for failure to charge an offense under the Travel Act.*[9]

9. Docket Item 6, pars. 1 & 2.

■■■ In a prosecution under the Travel Act, the plain language of 18 U.S.C. § 1952 requires that the defendants must be found to have traveled in interstate or foreign commerce or to have used a facility in interstate or foreign commerce with intent to take one or more of three types of actions in pursuit of an "unlawful activity" defined by § 1952(b). Counts 5 and 6 of this indictment invoke the portion of § 1952(b) defining "unlawful activity" as "bribery . . . in violation of the laws of the State in which committed . . . ." Likewise, in a prosecution for conspiracy to violate the Travel Act, it is required that the aim of the conspiracy be an "unlawful activity" within the special definitional requirements of § 1952(b). See *United States v. Kahn*, 472 F.2d 272, 277 (C.A.2, 1973), *cert. denied*, 411 U.S. 982, 93 S.Ct. 2270, 36 L.Ed.2d 958 (1973); *United States v. Polizzi*, 500 F.2d 856, 868–869 (C.A.9, 1974), *cert. denied*, 419 U.S. 1120, 95 S.Ct. 802, 42 L.Ed.2d 820 (1975); *United States v. LeFaivre*, 507 F.2d 1288, 1299 (C.A.4, 1974), *cert. denied*, 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 762 (1975); *United States v. Zirpolo*, 288 F.Supp. 993, 1010 (D.N.J.1968), rev'd on other grounds, 450 F.2d 424 (3 Cir., 1971). The gravamen of the motions now being considered is that it is not, and cannot be, a crime punishable under existing Delaware law to bribe or to offer a bribe to a prospective witness before a federal grand jury of this district.

Slawik and Capano appear to agree with the government that the literal wording of 11 Del.C. § 1261 (Rev.1974) criminalizes the acts of bribing a federal grand jury witness alleged in Counts 5 and 6 and that are alleged in Count 4 as being the aim of the conspiracy between Slawik and Capano. 11 Del.C. § 1261 (Rev.1974) reads:

[Bribing a witness in an official proceeding]

"A person is guilty of bribing a witness when he offers, confers, or agrees to confer, any benefit upon a witness or a person about to be called as a witness in any official proceeding upon an agreement or understanding that:

(1) The testimony of the witness will thereby be influenced; or

(2) The witness will absent himself from, or otherwise avoid or seek to avoid appearing or testifying at, the official proceeding."

The appropriate definitional provisions of the Delaware Code indicate that a "'benefit' means gain or advantage, or anything regarded by the beneficiary as gain or advantage, including benefit to any other person in whose welfare he is interested" and that "'official proceeding' includes any action or proceeding conducted by or before a legally constituted judicial . . . agency or official, in which evidence or testimony of witnesses may properly be received." 11 Del.C. § 1274 (Rev.1974).

■■■ Nevertheless, the Court concludes that the State of Delaware cannot criminalize an attempt to bribe a witness subpoenaed to testify before a federal grand jury of this district for two reasons. First, Austin's status and effectiveness as a source of information regarding possible violations of the *Travel Act* and other *federal statutes* in Delaware can be of interest only to the federal government, which is the sovereign whose grand jury had subpoenaed him to

give such testimony and whose courts have exclusive jurisdiction of all offenses arising under the federal criminal statutes, including the Travel Act. See 18 U.S.C. § 3231.[10] Consequently, alleged

10. "The district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States."

attempts to subvert the testimony of a federal grand jury witness *qua* witness are of exclusive concern to the federal government,[11] and indeed, that concern

11. It may be that after a federal grand jury witness testifies concerning "unlawful activities," within the meaning of 18 U.S.C. § 1952(b), as part of the federal grand jury's investigation of possible Travel Act violations, the state might be able to make use of his grand jury testimony as an investigative tool leading to indictments under state law such as, e. g., for receiving bribes as a public official of the state. (11 Del.C. § 1203 (Rev.1974)). However, since the relevant portions of the federal grand jury testimony cannot become public knowledge, if ever, unless a defendant chooses to impeach a government witness at *trial* with such grand jury testimony (18 U.S.C. § 3500) it is apparent that a state's interest in the effective operation of the federal grand jury system as a source of accurate information forming the basis of indictments in state courts for state criminal law violations, is too remote in time and attenuated, when compared with the interest of the federal government, to justify prosecution under state criminal law of the attempted bribery of a federal grand jury witness.

is manifested by the existence of 18 U.S.C. § 1503, which makes it unlawful for anyone to corruptly influence, obstruct, impede or endeavor to influence, obstruct or impede the administration of justice in the federal courts. Second, in *In Re Loney,* 134 U.S. 372, 10 S.Ct. 584, 33 L.Ed. 949 (1890), the Supreme Court specifically held that "the power of punishing a witness for testifying falsely in a judicial proceeding belongs peculiarly to the government in whose tribunals that proceeding is had." 134 U.S. at 375, 10 S.Ct. at 585. That case dealt with the question of whether the Virginia courts had jurisdiction to punish a witness pursuant to a state perjury law because of his false testimony before a state notary public whom Congress had deputized to take testimony relating to a contested election for the House of Representatives. Here in contrast to *Loney,* Delaware had no arguable formal identification with the federal grand jury proceedings and 11 Del.C. § 1261 (Rev.1974) does not specifically purport to punish elected or appointed Delaware officials for misuse of their office by attempting to bribe federal grand jury witnesses. Therefore, this Court is convinced that the State of Delaware has absolutely no cognizable and independent interest in utilizing her existing criminal legislation to ensure the integrity of the federal grand jury process or to punish those who attempt to tamper with that process.[12] That being the case, the Court

12. 18 U.S.C. § 3231 does close with the provision that "Nothing in . . . [Title 18] shall be held to take away or impair the jurisdiction of the courts of the several States under the laws thereof." However, this closing provision does not resolve particular jurisdictional questions arising under various state criminal statutes. See *Pennsylvania v. Nelson,* 350 U.S. 497, 501 n. 10, 76 S.Ct. 477, 100 L.Ed. 640 (1956).

will grant the motions to dismiss Counts 5 and 6 for failure to state the "unlawful activity" under Delaware law that is a necessary element of a Travel Act indictment and the Court will also grant the motion to dismiss Count 4 for failure to state an unlawful activity under Delaware law which must be the aim of a conspiracy to violate the Travel Act.

B. *Slawik's Motion to Dismiss Counts 10 and 11 for failure of the activities alleged therein to constitute a violation of Delaware law and hence of the Travel Act.*[13]

13. Docket Item 23, par. 3.

*Capano's Motion to Dismiss Count 10 for failure to charge an offense under the Travel Act.*[14]

14. Docket Item 6, par. 3.

Slawik and Capano attack Counts 10 and 11, which charge violations of the Travel Act, on the ground that Delaware law does not proscribe Slawik's alleged receipt of money at a time after he had

been elected New Castle County Executive but before he had taken office. Count 10 specifically refers to "Title 11, Delaware Code, Section 105 and Article II, Section 22, Delaware Constitution" as the state laws which were to be violated by the conspiracy entered into by Slawik and Capano between December 18 and December 21, 1972. Similarly, Count 11 charges that on December 18, 1972 Slawik used an instrumentality of interstate commerce to promote the crime of *bribery* in violation of these Delaware laws. These defendants contend that both Delaware provisions are codifications of the common law crime of bribery, which can only be committed by an individual who has been sworn into public office. In rebuttal, the government asserts that these two provisions of Delaware law are not limited to the receipt of bribes by those individuals who have already been sworn into office and that in any event, under former 11 Del.C. § 744 *et seq.*, [Public Officers and Employees] which was enacted June 21, 1972 and in effect when the conspiracy alleged in Count 10 and the events alleged in Count 11 transpired, the crime of *bribery* could be committed by someone who had been elected to public office but who had not officially taken office.

█ The Court will proceed directly to analyze the government's contention regarding former 11 Del.C. § 744 *et seq.*, [Public Officers and Employees] in view of the fact that the citations in Counts 10 and 11 to former 11 Del.C. § 105 and Art. II, Sec. 22 of the Delaware Constitution are not so prejudicial as to have misled the defendants as to the nature of the charges in Counts 10 and 11. Rule 7(c)(3), F.R.Cr.P. Indeed, the government now acknowledges the erroneous citations in Counts 10 and 11 of the indictment and it is apparent that a quick reference to the index to Chapter 5 of current Title 11 of the Delaware Code, entitled "Specific Offenses," would have led the defendants to 11 Del.C. § 1201 ("Bribery; Class D Felony") and to the annotation to the former *bribery* provisions of the Delaware Code.

With the Court's attention now properly focused on the relevant statute, the questions before it become (1) whether former 11 Del.C. § 744 *et seq.* criminalized as *"bribery"* certain actions taken by individuals who had been elected to public office but who had not yet been sworn in, and (2), if so, whether former 11 Del.C. § 744 *et seq.* was completely repealed upon the effective date of the current Delaware Criminal Code or whether the enacting legislation of the current Criminal Code contains a "savings clause" permitting the prosecution of individuals for acts committed before the effective date of the current Code so that an indictment now under 18 U.S.C. § 1952(a)(3), (b) and § 371 could be founded upon former 11 Del.C. § 744 *et seq.*[15]

15. The state statute of limitations could not present a problem since it is inapplicable to an indictment under the Travel Act. *United States v. Cerone*, 452 F.2d 274 (C.A.7, 1971), *cert. denied*, 405 U.S. 964, 92 S.Ct. 1168, 31 L.Ed.2d 240 (1972).

█ (1) To begin with, the Court will assume *arguendo* that the *bribery* provisions of the current Code, 11 Del.C. § 1201 *et seq.* (Rev.1974), do not pertain to the actions of individuals who have been elected to office but who have not yet been sworn in. This assumption is based on an interpretation of the current statute which defines "public servant" (who may be either the object of or initiator of an act of *bribery*) as "any officer of employee of the State or any political subdivision thereof . . . ." 11 Del.C. § 1209(4) (Rev.1974). In contrast former 11 Del.C. § 744 *et seq.*[16] encom-

16. Former 11 Del.C. § 745 unambiguously provided that:

[Bribery in official . . . matters] "(a) A person is guilty of bribery under the provisions of this section if he . . . solicits, accepts or agrees to accept from another, directly or indirectly:

(1) Any pecuniary benefit as consideration for the recipient's official action as a public servant . . . , or
(2) Any benefit or consideration for the recipient's official action as a public servant in an administrative . . . proceeding; or
(3) Any benefit or consideration for violation of a legal duty as a public servant . . . .

passed the activities of a broader constellation of individuals. The definitional section, former 11 Del.C. § 744, provided that " 'public servant' means any officer (whether executive, judicial, legislative or ministerial, and whether elected or appointed) . . . of any county . . . of the State . . . ; or any candidate for election to any state, county or local public office . . . ." Furthermore, a companion section, former 11 Del.C. § 749, entitled "Certain matters not to constitute a defense," specified that "it shall be no defense to any prosecution under the provisions of [former] § 745 . . . that a person whom the actor [defendant] sought to influence or otherwise affect or deal with was not qualified to act in the desired way, whether because he was a candidate for office, or *had not yet assumed office* . . . ." (Emphasis added). Thus, both former § 744 and § 749 express the notion that the *bribery* provisions of former 11 Del.C. § 745 were intended to apply to the corrupt actions of individuals who had been elected to office but who had not formally taken office. This being so, the activities alleged to have been undertaken or pursued by Slawik during the interim period before his official swearing in could constitute an indictable offense under former 11 Del.C. § 745 and could also give rise to an "unlawful activity" within the meaning of 18 U.S.C. § 1952(b) and § 371 if the current criminal law provisions of the Delaware Code and enabling legislation contain an appropriate "savings clause."

(2) Such a "savings clause" exists. 11 Del.C. § 102(a) (Rev.1974) currently provides that "prosecutions for offenses committed prior to July 1, 1973, shall be governed by the prior law, which is continued in effect for that purpose, as if this Criminal Code were not in force," and that "an offense was committed prior to July 1, 1973, if any of the elements of the offense occurred prior thereto." That "prior law" in the case of *bribery* is undoubtedly former 11 Del.C. § 744 *et seq.* [Public Officers and Employees] because the enabling legislation for the new Delaware Criminal Code (58 Del.Laws, ch. 497, Part II, Section 1 & Section 7, and 59 Del.Laws, ch. 5, Section 1) specified that all criminal provisions in Part I of Title 11, in which former § 744 *et seq.* was found, were to be repealed as of July 1, 1973 and that the new Criminal Code ·was "not apply to offenses committed prior to its effective date," viz., July 1, 1973.[17] It is true that current 11 Del.C. § 102(b)(2) (Rev. 1974) (as codified from 58 Del.Laws, ch. 497, Part II, Section 1, § 102(2)(b)) provides that in the case of offenses committed prior to July 1, 1973, those provisions of the current Criminal Code "according a defense . . . shall apply [to prosecutions pending or commenced after July 1, 1973 to offenses committed prior to that date,] with the consent of the defendant." However, since Appendix D of the official version of the current Delaware Criminal Code with Commentary, entitled "Table of Defenses Provided by This Criminal Code," does not list as a defense to the crime of

---

(b) A person is also guilty of bribery . . if he agrees to render or not to render official action as a public servant . . . as consideration for a pecuniary benefit being offered or conferred to or upon, or as consideration for a promise that a pecuniary benefit shall be offered or conferred to or upon, another person . . . ."

17. 58 Del.Laws, ch. 497, which adopted the current Criminal Code was signed into law on July 6, 1972 and contained a "savings clause" in Section 1, § 102(1), indicating that "this Criminal Code does not apply to offenses committed prior to its effective date." Section 7 of the same legislation read as follows: "This

act shall become effective on April 1, 1973." Approximately eight months later, in March 1973, the Delaware General Assembly amended Section 7 so as to now provide that the new Criminal Code would be effective on July 1, 1973. 59 Del.Laws, ch. 5, Section 1 (approved March 29, 1973).

Former *Delaware Code Annotated (1972 Non-cumulative Supplement)* does indicate that the "new" Criminal Code was to be effective as of April 1, 1973, but this volume was published in late 1972, before the passage of 59 Del.Laws, ch. 5, Section 1, which changed the effective date from April 1, 1973 to July 1, 1973.

*bribery* any Delaware Code section exonerating either expressly or by implication a defendant on the basis of his or her having accepted a so-called bribe before being officially sworn into public office, 11 Del.C. § 102(b)(2) (Rev.1974) is inapplicable to Counts 10 and 11. Therefore, the "prior law" that is referred to by the "savings clause" in the current Criminal Code (§ 102(a)) is former Section § 744 *et seq.*, statutory provisions which established a wider scope of the state's anti-bribery criminal laws into which the actions of defendants Slawik and Capano as alleged in Counts 10 and 11 fall.

For the above reasons, the Court will deny the motions of defendants Slawik and Capano to dismiss Counts 10 and 11 of the indictment.[18]

## C. *Slawik's Motion to Dismiss Counts 7, 8, 9 and 12 for failure to comply with Rule 7(c), F.R.Cr.P.*

Slawik attacks the three perjury counts (7, 8 and 9) and the subornation of perjury count (12) on the ground that they are "replete with artless questions,[19] summaries by the prosecutors of complex facts and suppositions, with no effort made to separate one from the other . . . descriptions of . . . [Slawik's] mental state." In Slawik's view this combination of omissions and the lack of crisp, direct and simple questions that Slawik and Petrillo should have been required to answer before the federal grand jury justify the dismissal of these four counts of the indictment under *Bronston v. United States*, 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973), which he cites for the proposition that "precise questioning is imperative as a predicate for the offense of perjury." [20]

*Bronston* dealt with the propriety of a prosecution under 18 U.S.C. § 1621 ("General Perjury Statute") [21] for the defendant's truthful but unresponsive answer which then gave rise to a false negative implication,[22] the govern-

**18.** Slawik also argues in support of his motion to dismiss counts 10 and 11 for failure to charge an offense under the Travel Act and § 371 that these counts do not allege that Petrillo's payment of Slawik's travel, lodging and entertainment expenses was in consideration of or for the purpose of influencing Slawik in the performance of his official duties. This argument was first raised in Slawik's brief (Docket Item 24), at which time it was directed to the supposed requirement of the Delaware Constitution, Article II, Section 22, that payment to a public official be made for either of these reasons. Slawik's counsel again made this point at oral argument, but this time directed his remarks to the bribery provision of the current Delaware Crim.Code, 11 Del.C. § 1201 *et seq.* (Rev.1974).

However, neither of the above provisions is applicable to the present case because former 11 Del.C. § 744 *et seq.* is the appropriate Delaware law upon which a Travel Act and § 371 indictment must be based here. Since Counts 10 and 11 charge that Petrillo and Slawik "discussed the position of the New Castle County Executive Office with respect to the [application for a gypsum by-product disposal permit]," this appears to meet the requirements of former 11 Del.C. § 745, which provided in relevant part that "a person is guilty of bribery . . . if he solicits . . . directly or indirectly . . . any benefit as consideration for violation of a legal duty as a public servant . . . ." In any case, the sufficiency of an indictment under the Travel Act is not tested by state law requirements. *United States v. Gerhart*, 275 F.Supp. 443, 454 (S.D.W.Va.1967); *United States v. Teemer*, 214 F.Supp. 952, 958 (N.D.W.Va.1963). *Cf. United States v. Shaffer*, 383 F.Supp. 339, 341 (D.Del.1974).

**19.** E. g., "How did it come up . . . ;" "Was he involved in this thing . . . ;" "So you just mentioned it to him casually. . . ." (Docket Item 24, at 21).

**20.** 409 U.S. at 362, 93 S.Ct. at 602.

**21.** 18 U.S.C. § 1621 provides in relevant part:
"Whoever, having taken an oath before a competent tribunal . . . in any case in which a law of the United States authorizes an oath to be administered, that he will testify . . . truly . . . , willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true, is guilty of perjury . . ."

**22.** The colloquy forming the basis of the perjury charge in *Bronston* was as follows:
"Q. Do you have any bank accounts in Swiss banks . . . ?
A. No sir.
Q. Have you ever?
A. The company had an account there for about six months, in Zurich."
409 U.S. at 354, 93 S.Ct. at 598.

ment maintaining that defendant's answer was perjurious because his answer was *intentionally* misleading. Assuming arguendo that defendant's answer had been shrewdly calculated to evade, nevertheless, the Supreme Court held that a prosecution under § 1621 was not permissible because, for one thing, the wording of § 1621 does not render it unlawful for a witness to have willfully made a true statement that gives rise to a false negative implication, and for another, the unresponsiveness of the defendant's answer should have been a sufficient signal to alert the questioner to the fact that his question had not been answered. *Bronston* is inapposite to this case, however, because the broadly worded proposition which Slawik quotes from the Supreme Court's opinion is found in the passage where the Court commented upon the ease with which the questioner could have eliminated the unresponsiveness of the answer given.[23] Thus, this "proposition" cannot and will not be read out of context to establish an ironclad rule that a perjury prosecution under 18 U.S.C. § 1621 or § 1623 fails if *prima facie* impeccable terminology or phraseology have not been used.

In the view of this Court, Slawik's motion to dismiss Counts 7, 8, 9 and 12 raises several discrete issues, which are as follows:

(1) Whether the questions posed by the Assistant United States Attorney in the excerpts contained in Counts 7, 8 or 9 were so ambiguous that, while Slawik's answers to them are possibly responsive, it would require inordinate speculation by the jury as to the meaning Slawik gave them before he answered them; (2) Assuming that the questions excerpted in Counts 7, 8 or 9 are not fatally ambiguous, is the phrasing of Slawik's answers to those questions so ambiguous that there would be impermissible speculation by the jury as to the meaning of his answers; (3) Whether the questions and answers excerpted in Count 12 (subornation of Petrillo's perjury) are ambiguous as described in (1) and (2) above; (4) Assuming that neither the questions nor answers in the excerpts contained in Counts 7, 8 and 9 are fatally ambiguous, do these three counts fail to indicate which answers are false.[24]

Each of the above issues may be raised by a motion to dismiss an indictment under 18 U.S.C. § 1623 and § 1622. It must appear reasonably likely from the face of the indictment that the minds of the questioner and of the witness met as to the meaning of the words used or phraseology employed in the questions and answers, otherwise a motion to dismiss must be granted on the ground that the questions and/or answers are fatally vague. *United States v. Ceccerelli*, 350 F.Supp. 475, 478 (W.D. Pa.1972); *United States v. Mazzei*, 400 F.Supp. 17, 19 (W.D.Pa.1975); *United States v. Ewert*, 372 F.Supp. 734, 735 (E.D.Wis.1974); *United States v. Chapin*, 515 F.2d 1274, 1279–1280 (C.A.D.C.1975), *cert. denied,* ——— U.S. ———, 96 S.Ct. 449, 46 L.Ed.2d 387 (12/8/75).[25] See *United*

**23.** Slawik's "proposition" appears in this passage, 409 U.S. at 362, 93 S.Ct. at 601.

"It does not matter that the unresponsive answer is stated in the affirmative, thereby implying the negative of the question actually posed; for . . . the examiner's awareness of unresponsiveness should lead him to press another question *or reframe his initial question with greater precision. Precise questioning is imperative as a predicate for the offense of perjury.*" (emphasis added).

**24.** Rule 7(c)(1), F.R.Cr.P., provides that "the indictment . . . shall be a plain, concise and definite written statement of the essential facts constituting the offense charged." Here, Count 12 *explicitly* charges that Petrillo testified falsely that he had not financed Melvin Slawik's trip to Puerto Rico and that he (Petrillo) did not engage in discussions in Puerto Rico with Slawik concerning the position of the New Castle County Executive Office with respect to an application for a gypsum by-product discharge permit then pending with the State of Delaware Department of Natural Resources and with the New Castle County Department of Public Works.

**25.** Thus, while the questions and answers forming the allegedly perjurious testimony under § 1623 need not be impeccably phrased, an

*States v. Cobert,* 227 F.Supp. 915, 918 (S.D.Cal.1964); *United States v. Lattimore,* 94 U.S.App.D.C. 968, 215 F.2d 847, 853 (1954). *Cf. United States v. Larocca,* 245 F.2d 196, 198–199 (C.A.3, 1957). Moreover, an indictment alleging perjurious testimony must "apprise the defendant 'with reasonable certainty, of the nature of the accusation against him . . .' [it must contain] such a statement of the facts and circumstances as will inform the accused of the specific offense . . . with which he is charged." *Russell v. United States,* 369 U.S. 749, 765, 82 S.Ct. 1038, 1047, 8 L.Ed.2d 240 (1962). Counts 7, 8 and 9 will be found wanting if they do not clew Slawik in as to what he allegedly lied about.

Turning to Slawik's grand jury testimony excerpted in Counts 7, 8 and 9, it can fairly be said that there was a meeting of the minds of Slawik and the Assistant United States Attorney as to the meaning of the questions propounded and of the answers given.

■ Count 7 deals with Slawik's conversations with Austin. After the Assistant United States Attorney asked Slawik "You wanted to talk to [Austin] and tell [Austin] what?" Slawik unequivocally answered that he wanted to tell Austin that Austin did not have a problem in Delaware and that he had tried to convince Austin to come to Delaware to testify before the federal grand jury. Almost immediately after this colloquy, Slawik requested a chance to "explain" and when the Assistant United States Attorney allowed him to do so, Slawik related (1) what Austin had told him, viz., that if Austin were to come to Delaware he would be jailed, and (2) Slawik's response to Austin's statement, viz., "get yourself legal counsel, tell them the truth." Count 7 closes with this excerpt:

> "Q. So, basically, your trip down there revolved around a discussion with him to convince him to come up here and testify, get it over with, and be truthful?
>
> A. Get the damn thing over with and nobody is going to hold you, nobody is going to do anything."

When considered as a whole, Slawik's recapitulation indicates that, while in Florida, he had tried to convince Austin to come to Delaware to testify truthfully before the federal grand jury. Such a reading is reasonable and thus Count 7 does not suffer from fatal vagueness, although to be sure, the almost conversational tone of the questions and answers is a far cry from the normally precise and probing give-and-take between prosecutor and grand jury witness.

■ Count 8 charges that Slawik testified falsely as to his knowledge of others who may have been involved with his conversations with Austin in Orlando, Florida and the extent of that involvement. According to this count, Slawik testified before the grand jury that "we contacted a lawyer up [in Delaware]; that the lawyer that was contacted was Mr. Arthur Inden and the suggestion came from Danny Rappa;" that he had discussed "Austin's situation" with Rappa, that he might have mentioned "Austin's situation" to Pete Ross and that he thinks he even talked to Tom Luce about "Austin's situation." One of the Assistant United States Attorneys then asked:

> "Q. What did Danny Rappa have to do with this?
>
> A. Nothing, only insofar as suggesting a lawyer, his lawyer."

The colloquy continued:

> "Q. How did it come up, just in casual conversation?
>
> A. Yes.
>
> Q. Was he involved in this thing?

individual cannot be punished for failing to answer a question he could not possibly have understood or for supplying an answer which is subject to innumerable interpretations since under § 1623 it is unlawful to *knowingly* make a false material declaration and since a neces-

sary element of an offense under § 1622 is that the testimony allegedly suborned be perjurious under § 1623. *United States v. Gross,* 511 F.2d 910, 914–916 (C.A.3, 1975), *cert. denied,* 423 U.S. 924, 96 S.Ct. 266, 46 L.Ed.2d 249 (1975).

A. Directly, no."

Finally, another Assistant United States Attorney interjected:

"Q. So you just mentioned it to him casually?

A. Yes."

Although the latter portions of the above excerpt are replete with indefinite and ambiguous articles and terms which might have led Slawik to misunderstand the questions, this sloppy questioning does not vitiate the indictment for three reasons. First, had Slawik failed to understand the meaning of the questions, he could have asked for a clarification of the language used. *Cf. United States v. Chapin*, 515 F.2d at 1283; *United States v. Lattimore*, 215 F.2d at 853. Second, had the Assistant United States Attorneys thought Slawik was confused about the meaning of the questions, they would have clarified the meaning of the words "it" and "this." Third, the words "it" and "this" are located immediately after Slawik's answer concerning his discussion with Rappa about "Austin's situation" which in turn refers back to Slawik's visit to Orlando and his earlier discussions with Austin concerning Austin's grand jury subpoena.

█ Count 9 of the indictment is based on Slawik's allegedly false testimony with respect to his knowledge of the financing for a house purchased by Austin in Orlando, Florida. Careful perusal of this portion of the grand jury transcript quoted in Count 9, at which time the Assistant United States Attorney asked a series of fairly specific questions, indicates that Slawik understood the aim of the questions. To begin with, there are no inherently ambiguous terms or phrases sprinkled in this dialogue. On the contrary, Slawik specifically testified that on a trip to Orlando, financing did not occur; that Slawik could not tell the grand jury anything about the details concerning the steps Mario [Capano] took to secure the money that he intended to borrow; that Slawik was aware that Capano had helped Austin secure a mortgage but that Slawik was not certain of the method Capano used to se-

cure the mortgage and that Slawik did not give Austin any money.

Count 12, of course, is the subornation of perjury count and this count specifically alleges that Petrillo testified falsely that he did not finance Slawik's trip to Puerto Rico and that he did not discuss with Slawik Allied Chemical Company's applications for a gypsum by-product disposal permit. During the course of the colloquy before the grand jury excerpted in Count 12, Petrillo unequivocally stated that he did not remember who paid for Slawik's airline tickets and that he did not pay for the "hotel bill" in Puerto Rico. After the Assistant United States Attorney established that at some point in time Petrillo had gone to see Slawik about the disposal permit (although Petrillo noted that "[h]e was in Slawik's office") the questioning turned to other matters but then was resumed along these lines:

"Q. Now do you remember why you went to Puerto Rico with them?

A. I just had a chance. I never had been to Puerto Rico and I had a chance to go so I went along with them.

Q. It did not have anything to do with getting the permit for the Minquadale property?

A. No, sir. I knew I was a dead duck before I went down there.

Q. How did you know that?

A. From Environmental because I was told by Vasuki. I was told by Vasuki at the meeting that in no way would he okay that land fill.

Q. What is the name?

A. Mr. Vasuki of Environmental.

*Q. Were you attempting to get Slawik to change his mind?

A. Slawik don't have anything to do with it, sir. My situation was strictly between Environmental and Petrillo, Denny Petrillo.

Q. Well, you went and talked to Slawik about it.

A. I went to talk to Slawik about it. If I got the permit from Environmental to do it I would have to get a permit with the County. Yes, sure, I went to talk to Slawik about it. There is nothing wrong in that. I don't see anything wrong in that.

Q. But you said you also had to get a permit from the County.

A. If Environmental okayed it then I had to get a permit from the County. Mel told me if they give you an okay there is no reason why we should not give you a permit.

*Q. Okay. And your trip to Puerto Rico didn't have anything to do with that?

A. No, sir. I just went on a trip. I had a chance to go. I had been in business for 50 some years and I just retired and I had a chance to go on a trip. . . ."

It is apparent that at least at one point in the grand jury transcript contained in Count 12 Petrillo testified that he did not pay anyone's expenses in Puerto Rico but his own, testimony which is the polar opposite of the allegation in Count 12 that "Dennis A. Petrillo did finance the trip of MELVIN A. SLAWIK to Puerto Rico. . . ." Furthermore, a close reading of the excerpt in Count 12 shows that while Petrillo stated that he had had discussions with Slawik concerning Allied Chemical's application for a disposal permit pending before the New Castle County Department of Public Works, Petrillo denied that he had requested Slawik to intervene with the Delaware Department of Natural Resources and Environmental Control with respect to Allied Chemical's application for a disposal permit pending before this state agency and furthermore, Petrillo denied that the December 1972 vacation to Puerto Rico that he took with Slawik had anything to do

with either of these applications for a permit.

 It is true that two key questions [26] taken out of context appear to be fatally ambiguous, but this Court is satisfied that such is not the case. First, when Petrillo was asked whether he was attempting to get Slawik to change "his" [Slawik's or Vasuki's] mind Petrillo answered both possible versions of the question by stating that Slawik had nothing to do with Petrillo's "situation," the matter instead being *strictly* between the state environmental agency and Petrillo. The second arguably ambiguous question, "And your trip to Puerto Rico didn't have anything to do with that?", refers to the applications for a disposal permit pending both before the Delaware Department of Natural Resources and Environmental Control and before the New Castle County Department of Public Works. To this question, Petrillo unqualifiedly answered "no."

For the above reasons, the Court concludes that the excerpt in Count 12 is not so ambiguous that it can be said that Petrillo was unable to understand the questions asked of him.

 The Court also concludes that Counts 7, 8 and 9 adequately inform Slawik which statements in the excerpts allegedly are false. Count 7 unequivocally charges that Slawik testified falsely regarding *his* own conversations with Austin, and the short excerpt in that count unquestionably is directed to the substance of those conversations and Slawik's motive for telling Austin what he claims to have told him. Count 8, which contains an especially brief series of questions and answers, charges that Slawik testified falsely regarding his knowledge of others who may have been involved with Slawik's conversations with Austin and the extent of that involvement. The questions and answers here focus on a few individuals (Danny

---

26. Each arguably ambiguous question in the excerpt quoted *supra*, pp. 207–208, is preceded by an asterisk.

Rappa, Pete Ross, and Tom Luce) but since Slawik only states that he "might have" talked to Ross and Luce, it is apparent that the allegedly false testimony in this count pertains to Rappa's involvement, and indeed, the excerpt opens with a discussion about contacting Rappa's lawyer and closes with Slawik's stating that he had talked to Rappa "casually about Austin." Count 9 charges that Slawik testified falsely about his knowledge of the financing of the house in Orlando, Florida that Austin had purchased. Although the grand jury testimony excerpted here consists of 18 sets of questions and answers, in most of them Slawik apparently admitted that he went to Orlando, Florida to assist in the appraisal of the house and that he knew that Capano had helped Austin obtain a mortgage. It is only in a few answers that Slawik either denies knowledge of the *"details"* of the financing or denies giving Austin any money as part of that financing. These two denials appear to be at the core of the charges in Count 9 and the Court is satisfied that for purposes of a motion to dismiss, this count adequately informs Slawik of what false statements he is alleged to have made.

Thus, Slawik's motion to dismiss Counts 7, 8, 9 and 12 for failure to comply with Rule 7(c), F.R.Cr.P., will be denied.

D. *Slawik's Motion to Dismiss the entire indictment for violation by the Government of the secrecy stricture of Rule 6(e), F.R.Cr.P.*

The factual background relative to this motion is as follows:[27] Grand Jury No. 2 ("Old Grand Jury No. 2"), which was first convened on October 10, 1973, conducted the basic investigation of the alleged events giving rise to the present indictment. It was before that grand jury that Slawik testified on December 11, 1974 and Petrillo testified on March 4, 1975. Old Grand Jury No. 2, just before its legal term of 18 months expired,[28] was discharged as of April 8, 1975 without having returned an indictment against any of the present defendants.

A Successor Grand Jury No. 1 first met on November 19, 1974. Sometime after March 11, 1975, the full transcript of the record developed before Old Grand Jury No. 2 with respect to the defendants was read in full to Successor Grand Jury No. 1 together with some additional evidentiary material which had not come into possession of the grand jury until after the term of Old Grand Jury No. 2. It was Successor Grand Jury No. 1 which returned an indictment on June 18, 1975 against Slawik, Capano, Rappa and Uffelman. The June 18 indictment was returned after the United States Attorney's Office had informed Slawik of the non-acceptance of Slawik's offer to appear before Successor Grand Jury No. 1 and answer any questions it might have as to his prior testimony before Old Grand Jury No. 2.

The June 18 indictment consisted of eight counts.[29] Count 1 charged a conspiracy on the part of the defendants and others known and unknown to violate 18 U.S.C. § 1503 ("Influencing Witness") and § 1510 ("Obstruction of Criminal Investigation") from March 1973 until June 1975 by employing Austin outside of the State of Delaware, at first in Maryland and then in Florida and subsequently by financing Austin's purchase of a house in Orlando, Florida. Count 2 charged the defendants with a substantive violation of § 1510 as described in Count 1; Count 3 charged the defendants and others known and unknown with a substantive violation of § 1503. Counts 4, 5 and 6 each charged Slawik with a violation of 18 U.S.C. § 1623 ("False Declaration Before Grand Jury . . ."). Count 7 charged a conspiracy of defendants Slawik and Capano

---

**27.** The facts were gleaned from records in the Clerk's Office, affidavit of Bruce M. Stargatt (Docket Item 20), affidavit of Alan J. Hoffman (Docket Item 56) and representations made by Alan J. Hoffman, Assistant United States Attorney, in Docket Item 50.

**28.** Rule 6(g), F.R.Cr.P.

**29.** Docket Item 1, Cr. A. No. 75–84.

along with Austin, who was named as a defendant, stretching from December 1972 through October 1973, to violate 18 U.S.C. § 1951 by agreeing to use the office of New Castle County Executive to obtain a trip to Puerto Rico for Slawik, Capano and Austin, plus $500 in cash for Slawik. Finally, Count 8 charged Slawik with a substantive violation of § 1951 on the basis of his alleged extortion in December 1972 of about $2,100 in the form of a trip to Puerto Rico.

After the defendants filed numerous pre-trial motions in opposition to the June 18 indictment, that indictment was abandoned and the government obtained the present superseding indictment from Successor Grand Jury No. 1 on July 31, 1975. Again Successor Grand Jury No. 1 was reacquainted with the evidence on the basis of reading all of the record developed before Old Grand Jury No. 2 and upon consideration of the additional evidentiary material which it alone had received.

Slawik has moved to dismiss the superseding indictment as to him because of prosecutorial misconduct in disclosing the minutes of a non-indicting grand jury to a second grand jury in violation of the secrecy requirements of Rule 6(e), F.R.Cr.P. Slawik's argument runs: (1) under the provisions of Rule 6(e) the mantle of secrecy cloaking proceedings before a grand jury may be lifted only by order of the Court, (2) that the sole exception in Rule 6(e) is that "disclosure of matters occurring before the grand jury . . . may be made to the attorneys for the government for use in the performance of their duties", (3) that in this case the government attorneys disclosed the proceedings before Old Grand Jury No. 2 on two occasions to Successor Grand Jury No. 1 in order to obtain the June 18 indictment and the July 31, 1975 superseding indictment without Court approval, and (4) that the exception to disclosure quoted above by its strict terms does not authorize a prosecutor to make the proceedings before one grand jury known to a second grand jury without a court order. Slawik further argues that if this were not so it would permit "grand jury shopping" by the prosecutor and he implies that "grand jury shopping" may have occurred in this case since the first grand jury did not indict Slawik.

 Slawik's exact arguments in support of the present motion were made before the Court of Appeals for the Second Circuit in *United States v. Garcia*, 420 F.2d 309 (C.A.2, 1970) and there rejected. In the *Garcia* case, the defendant had been convicted of two counts of perjury and one count of filing a false statement before a federal grand jury in Connecticut. The defendant had filed a statement with one federal grand jury on June 16, 1967 and had testified before that grand jury on February 27, 1968. Nearly a year later on February 18, 1969 a different federal grand jury in Connecticut returned the indictment for which the defendant was tried and convicted. As in the present case, Garcia argued on appeal that the use of her statement and testimony given to the first federal grand jury by the second federal grand jury without court approval was in violation of Rule 6(e), F.R.Cr.P. In rejecting Garcia's argument, the Court stated at 311: [30]

30. The panel consisted of Chief Judge Lumbard, Judge Friendly and District Judge Judd, sitting by designation.

"The rule [6e] itself provides that disclosure 'may be made to the attorneys for the government for use in the performance of their duties.' Surely the performance of his duty by the United States Attorney required him to prosecute any perjury committed before a grand jury, and to do so before the same grand jury or any grand jury constituted for the district where the perjury had been committed. No purpose would be served by requiring the court to approve a use of grand jury minutes which is implicit in the duties of the United States Attorney.

There has never been any question of the right of government attorneys

to use grand jury minutes, without prior court approval, in preparation for trial and even to make them public at trial to the extent of referring to such minutes during the examination of witnesses. I Wright, Federal Practice and Procedure, Criminal, § 107, and cases cited therein at notes 16 and 17 (1969). If government attorneys have the right to use grand jury minutes to the extent of making them public during a trial, without court approval, it is certainly no less a proper performance of their duties to use them without court approval before another grand jury where the proceedings are secret and the purpose is the enforcement of the perjury and false statement statutes. We are not persuaded to the contrary by anything in the holding or language of Chief Judge Thomsen in In re Grand Jury Investigation of the Banana Industry, 214 F.Supp. 856 (D.Md.1963), where the permission sought was for use in another district of another circuit."

 This Court, finding the rationale of the *Garcia* case persuasive, adopts and applies it to the instant motion. Furthermore, in view of the representations made by the Assistant United States Attorney who handled the matter, that the entire transcript of the proceedings before Old Grand Jury No. 2 was read to Successor Grand Jury No. 1 [31]

31. Docket Item 50, p. 3.

and that no effort was ever made to obtain an indictment from the first grand jury,[32] the Court will not speculate

32. Docket Item 56, par. 3.

on the mere possibility that abuses suggested by Slawik occurred, because "an indictment returned by a legally constituted and unbiased grand jury, like an information drawn by a prosecutor, if valid on its face, is enough to call for a trial of the charge on the merits and satisfies the requirements of the Fifth Amendment." *Lawn v. United States*, 355 U.S. 339, 349, 78 S.Ct. 311, 317, 2 L.Ed.2d 321 (1958). Furthermore, the law is well-settled that a prosecution will not be abat-

ed or barred even where tainted evidence unconstitutionally obtained has been presented to a grand jury, *United States v. Blue*, 384 U.S. 251, 255, 86 S.Ct. 1416, 16 L.Ed.2d 510 (1966); *United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); *United States ex rel. Almeida v. Rundle*, 383 F.2d 421, 424 (C.A.3, 1967), *cert. denied*, 393 U.S. 863, 89 S.Ct. 144, 21 L.Ed.2d 131 (1968), and thus assuming *arguendo* that Rule 6(e) was violated by disclosing the minutes of the earlier grand jury to the later grand jury during a continuous, extended and complicated investigation, that technicality would likewise not abate or bar an indictment valid on its face.

 Slawik also complains that an abuse occurred when his offer to appear before the second grand jury was ignored or rejected and he was then indicted for perjury. The record is unclear when or how this offer was made. Apparently the offer was made sometime after the life of Old Grand Jury No. 2 expired on April 8, 1975 and before Successor Grand Jury No. 1 returned the first indictment containing the perjury counts[33] on June 18, 1975. According to

33. Perjury Counts 4, 5 and 6 of the June 18, 1975 indictment are comparable to perjury Counts 7, 8 and 9 of the superseding indictment.

Slawik he offered "to appear before the new grand jury to answer any questions it might have as to his prior testimony. . . ."[34] However, neither the grand

34. Docket Item 20, par. 3; Docket Item 24, p. 27.

jury nor the government attorneys' non-acceptance of Slawik's offer is an indication that any prosecutorial abuse occurred. This is so for three reasons. First, Slawik's offer to appear before the grand jury clearly indicates that it was not for the purpose of admitting that his prior testimony was false in any respect so as possibly to be encompassed within the recantation provisions of 18 U.S.C. § 1623(d). Second, Slawik's offer was

simply a conditional one, in that he would appear and answer any questions which the grand jury might have with respect to his former testimony. It is reasonable to infer that the grand jury failed to recall Slawik because it had no further questions to ask him regarding his former testimony, and such an act of discretion can not be termed a prosecutorial abuse. Finally, if Slawik's offer to appear could be twisted into a "demand" to appear as a witness before Successor Grand Jury No. 1, this would be ineffective because a witness "is not entitled to set limits to the investigation that the grand jury may conduct," *Blair v. United States*, 250 U.S. 273, 282, 39 S.Ct. 468, 471, 63 L.Ed. 979 (1919), and "may not interfere with the course of the grand jury's inquiry," *United States v. Calandra*, 414 U.S. 338, 345, 94 S.Ct. 613, 618, 38 L.Ed.2d 561 (1974). Thus, whether Slawik was to be recalled to appear was a matter for determination solely by the grand jury and not by Slawik.

Accordingly, Slawik's motion to dismiss for so-called prosecutorial misconduct will be denied.

## II. MOTIONS FOR SEVERANCE.

1. *Slawik's Motion for Severance Pursuant to Rules 8(a), 8(b) and 14.*[35]

 35. Docket Item 23.

 *Uffelman's Motion pursuant to Rule 14.*[36]

 36. Docket Item 22.

 *Rappa's Motion to Sever pursuant to Rule 8(b) and Rule 14.*[37]

 37. Docket Item 13.

 *Capano's Motion to Sever pursuant to Rules 8(a), 8(b) and 14.*[38]

 38. Docket Item 8.

The Court having dismissed Counts 4, 5 and 6, the remaining counts subject to these motions are Counts 1, 2, 3, 7, 8, 9, 10, 11, 12 and 13. Each of the defendants, as well as the government, using various methodologies supposedly mandated by Rules 8(a), 8(b) and 14, F.R. Cr.P., have arrived at numerous conflicting combinations of counts that may be set down for trial together or individually.

The Court will begin this task by assessing misjoinder under Rule 8(b), which provides,

> "Two or more defendants may be charged in the same indictment . . . if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses."

Rule 8(b) is the mechanism for assessing misjoinder when a defendant named in one count attacks the joinder of other counts in the same indictment that do not contain charges against him or when one of the defendants in a multiple-defendant count attacks joinder of one or more other such multiple-defendant counts. *United States v. Isaacs*, 493 F.2d 1124, 1158 (C.A.7, 1974), *cert. denied, Kerner v. U. S.*, 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974), reh. denied, 418 U.S. 955, 94 S.Ct. 3234, 41 L.Ed.2d 478 (1974); *United States v. Somers*, 496 F.2d 723, 729 n. 8 (C.A.3, 1974), *cert. denied*, 419 U.S. 832, 95 S.Ct. 56, 42 L.Ed.2d 58 (1974); *United States v. Papadakis*, 510 F.2d 287, 299–300 (C.A.2, 1975), *cert. denied*, 421 U.S. 950, 95 S.Ct. 1682, 44 L.Ed.2d 104 (1975); *United States v. Eagleston*, 417 F.2d 11, 14 (C.A.10, 1969); *United States v. Bova*, 493 F.2d 33, 35 (C.A.5, 1974). *Cf. Cupo v. United States*, 123 U.S.App.D.C. 324, 359 F.2d 990, 992–993 (1966), *cert. denied*, 385 U.S. 1013, 87 S.Ct. 723, 17 L.Ed.2d 549 (1967). Thus, the Court will assess for possible misjoinder under Rule 8(b) the joinder of the multiple-defendant counts with each other (Counts 1, 2, 3 and 10), and the joinder of the multiple-defendant counts with the single defendant counts (Counts 7, 8, 9, 11, 12 and 13). This entails disposition of Capano's and Rappa's misjoinder motions and Slawik's misjoinder motion in so far as it attacks the joinder of Counts 1, 2, 3 and 10 with each other. And if misjoinder is apparent on the face of the indictment, this Court has no discretion to assent to trial of the defendants so misjoined.

*Somers*, 496 F.2d at 729; *United States v. Graci*, 504 F.2d 411, 412 (C.A.3, 1974);[39] *United States v. Rickey*, 457

39. In *Garci*, the Third Circuit panel recognized that the circuits are split as to whether or not misjoinder could be a matter of harmless error under Rule 52(a), F.R.Cr.P., and that this Circuit had not yet ruled on the issue. 504 F.2d at 414.

F.2d 1027, 1029 (C.A.3, 1972), *cert. denied*, 409 U.S. 863, 93 S.Ct. 153, 34 L.Ed.2d 110 (1972); *United States v. Stafford*, 382 F.Supp. 1401, 1402 n. 1 (E.D.Pa.1974); *United States v. Franks*, 511 F.2d 25, 29 (C.A.6, 1975), *cert. denied*, 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 693 (June 24, 1975); *Papadakis, supra*, 510 F.2d at 300.[40]

40. *Contra King v. United States*, 355 F.2d 700, 704 (C.A.1, 1966); *United States v. Florio*, 315 F.Supp. 795, 796–797 (E.D.N.Y.1970) (dictum); *United States v. Martinez*, 479 F.2d 824, 828 (C.A.1, 1973); *United States v. Bally Manufacturing Corp.*, 345 F.Supp. 410, 429 (E.D.La. 1972) (dictum).

■ Absent from either the multi-defendant counts or the single defendant counts of the instant indictment are cross references or other allegations which explicitly tie into the same "series of acts or transactions" the trip to Puerto Rico (Counts 10 and 11), the trip to Florida and telephonic communications with Austin (Counts 1, 2 and 3), Slawik's alleged perjury before the federal grand jury in Delaware (Counts 7, 8 and 9), Slawik's alleged subornation of Petrillo's perjury (Count 12) and Slawik's alleged obstruction of justice (Count 13). The Court is also unable to imply or infer that each count relates to "the same series of acts or transactions," as required by Rule 8(b), F.R.Cr.P., for careful review of the indictment shows only (1) that Slawik, Capano, Austin and Petrillo flew to and vacationed in Puerto Rico in late December 1972, during which "trip" Slawik allegedly discussed the Allied Chemical Corporation's gypsum by-product disposal permit applications, (2) that from May 1974 until October 1974 Slaw-

ik, Capano, Uffelman and Rappa conspired to prevent Austin from testifying before the federal grand jury in Delaware and also to prevent Austin from communicating with the FBI, and that during the same period they committed acts in violation of 18 U.S.C. §§ 1503 and 1510, (3) that on December 10, 1974 Slawik testified falsely before the federal grand jury about his trip to Orlando, Florida to visit Austin, Rappa's involvement with Austin, and the financing of Austin's house in Orlando, and (4) from September 1974 until March 4, 1975 Slawik allegedly suborned the perjury of Dennis Petrillo who had been subpoenaed to appear before the federal grand jury in Delaware to testify, Slawik thereby also obstructing justice. While it might be possible to construct a leitmotif connecting each of the 13 counts of this indictment to the others, Rule 8(b) demands much more if multiple counts naming multiple defendants are to be joined properly in one indictment. There simply is no "series of acts or transactions" apparent on the face of the indictment into which all 13 counts fall. See *United States v. Grasso*, 55 F.R.D. 288 (E.D.Pa.1972).

■ In the view of this Court, there are two series of "acts or transactions" within the meaning of Rule 8(b) and these are (1) Counts 1, 2 and 3 and (2) Counts 10 and 11. Counts 1, 2 and 3 constitute the "same series of acts or transactions" because "joinder is permitted of a conspiracy count and substantive counts arising out of the conspiracy, since the claim of conspiracy provides a common link," *United States v. Somers*, 496 F.2d 723, 729–730 (C.A.3, 1974), *cert. denied*, 419 U.S. 832, 95 S.Ct. 56, 42 L.Ed.2d 58 (1974). Similarly, Counts 10 and 11 constitute the "same series of acts or transactions" even though Count 11 charges only Slawik. See *United States v. Gimelstob*, 475 F.2d 157 (C.A.3, 1973); *United States v. Albowitz*, 380 F.Supp. 553, 555 (E.D.Pa.1974). However, Counts 12 and 13 are not part of

the "same series of acts or transactions" as Counts 10 and 11 because the subornation of perjury and obstruction of justice occurred too long after the events alleged in Counts 10 and 11. *Accord, United States v. Mitchell*, 372 F.Supp. 1239, 1255–1256 n. 26 (S.D.N.Y.1973), appeal dismissed sub. nom. *Stans v. Gagliardi*, 485 F.2d 1290 (C.A.2, 1973); *United States v. Daddano*, 432 F.2d 1119, 1125 (C.A.7, 1970), *cert. denied*, 402 U.S. 905, 91 S.Ct. 1366, 28 L.Ed.2d 645 (1971). *But see United States v. Haim*, 218 F.Supp. 922 (S.D.N.Y.1963). Finally, the Court holds that Counts 7, 8 and 9 are not part of the "same series of acts or transactions" as Counts 1–3. There is authority to the effect that joinder is proper under Rule 8(b) "if 'a direct connection [exists] between each of the perjury charges and one or more of the overt acts connected with . . . [a] conspiracy count,' " *United States v. Mitchell*, 372 F.Supp. at 1255, citing *United States v. Sweig*, 316 F.Supp. 1148, 1158 (S.D.N.Y.1970), *aff'd*, 441 F.2d 114, 118 (C.A.2, 1971), *cert. denied*, 403 U.S. 932, 91 S.Ct. 2256, 29 L.Ed.2d 711 (1971) and other authorities. However, *Mitchell, Sweig* and most of the other cases therein cited arose in situations where each defendant, named in a conspiracy count, was also charged with having committed perjury about the same subject matter charged in the conspiracy count. *E. g., United States v. Cohn*, 230 F.Supp. 587 (S.D.N.Y.1964), *aff'd* sub. nom. *Application of Gottesman*, 332 F.2d 975 (C.A.2, 1964). See also *United States v. Isaacs*, 493 F.2d 1124, 1159 (C.A.7, 1974), *cert. denied, Kerner v. U. S.*, 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974). Here each of the defendants named in Counts 1, 2 and 3 (other than Slawik) who could have brought a Rule 8(b) motion has objected in some fashion to the joinder of Counts 7, 8 and 9 with Counts 1, 2 and 3,[41] and despite some common facts un-

41. See Docket Item 14 (Rappa's Opening Brief in Support of Motion to Sever); Docket Item 22 (Uffelman's Motion for Relief from Prejudicial Joinder); Docket Item 8 (Capano's Motion

for Severance of Counts 1–6 from 7–9 from 10–11 from 12–13).

derlying the two sets of counts, the offenses charged in each count are not part of "the same series of acts or transactions."

As it now stands, therefore, pursuant to Rule 8(b), the case must be divided into three trials involving (1) Counts 1, 2, and 3 (Slawik, Uffelman, Rappa and Capano), (2) Counts 10 and 11 (Slawik and Capano), and (3) Counts 7, 8, 9, 12 and 13 (Slawik).

2. *Slawik's Motion pursuant to Rule 8(a) to Sever Counts 1–9 from Counts 10–13.*[42]

42. Docket Item 23.

 *Capano's Motion pursuant to Rule 8(a) to Sever Counts 1–9 from Counts 10–13.*[43]

43. Docket Item 8.

 Because of the Court's ruling above, Capano's Rule 8(a) motion no longer has any relevance to this case and will be dismissed. As far as Slawik's Rule 8(a) motion is concerned, the Court finds that Counts 7, 8 and 9 charging Slawik with perjury before the grand jury and Counts 12 and 13 charging him with subornation of Petrillo's perjury before the grand jury and with obstructing justice by corruptly influencing Petrillo to testify falsely to the grand jury are all offenses of such similar character and are so closely interrelated to a common plan for covering-up and misleading the grand jury investigation that they are properly joined for trial against only defendant Slawik. *United States v. Weber*, 437 F.2d 327, 331 (C.A.3, 1970), *cert. denied*, 402 U.S. 932, 91 S.Ct. 1524, 28 L.Ed.2d 867 (1971).

3. *Capano's Motion pursuant to Rule 14 for separate trial on each count in which he is a named defendant.*[44]

44. Docket Items 8 and 9.

 *Uffelman's Motion Pursuant to Rule 14 for separate trial as to him on Counts 1, 2 and 3.*[45]

45. Docket Item 22.

These two motions seek a further severance of counts and defendants under Rule 14, F.R.Cr.P.[46] However, after careful consideration, the Court denies these two motions because Rule 14 leaves to the discretion of the trial court the advisability of severing either multiple counts or multiple defendants "if it appears that a defendant . . . is prejudiced by a joinder of offenses or of defendants." *United States v. Armocida,* 515 F.2d 29, 46 (C.A.3, 1975).

Capano has requested the Court to sever all three counts from each other, so that he could have separate trials on Counts 1, 2, 3 and 10 in which he is named a defendant. Since the Court has already severed Counts 10 and 11 from Counts 1, 2 and 3 under Rule 8(b), it need only consider Capano's arguments under Rule 14 for severance of Counts 1, 2 and 3 from each other. Capano claims that he will suffer prejudice from a joint trial of Counts 1, 2 and 3 since he might want to testify regarding some, but not all of these counts, and if he chooses to adhere to that decision at trial, his pleading of the Fifth Amendment could damage the creditability of his testimony with respect to the count or counts he does testify about. However, it is the law of this and other circuits that mere allegation of such prejudice is patently insufficient to justify severance. *United States v. Weber,* 437 F.2d 327, 333–334 (C.A.3, 1970), *cert. denied,* 402 U.S. 932, 91 S.Ct. 1524, 28 L.Ed.2d 867 (1971); *United States v. Williamson,* 482 F.2d 508, 512 (C.A.5, 1973); *Baker v. United States,* 131 U.S. App.D.C. 7, 401 F.2d 958, 976–978 (1968), *cert. denied,* 400 U.S. 965, 91 S.Ct. 367, 27 L.Ed.2d 384 (1970). *Cf. United States v. Fluellen,* 396 F.Supp. 1168 (E.D.Pa. 1975). Instead, a defendant must point to specific indicia of prejudice and there appear to be none here, as Counts 1, 2 and 3 are closely related with respect to the elements that the government must prove for each offense charged and it is therefore likely that the evidence offered for one count will be admissible for most of the counts.

Uffelman, on the other hand, addresses his Rule 14 motion toward seeking a separate trial on Counts 1, 2 and 3 in which he would be the only defendant. He maintains that while he is charged in Counts 1, 2 and 3, the indictment specifies that he aided the accomplishment of only 3 overt acts (listed in Count 1), whereas his co-defendants are charged with having participated in many more such acts. However, this contention does not justify severance under Rule 14 because "a defendant is not entitled to a severance merely because evidence against a co-defendant is more damaging than the evidence against the moving party." *United States v. Somers,* 496 F.2d 723, 730 (C.A.3, 1974), *cert. denied,* 419 U.S. 832, 95 S.Ct. 56, 42 L.Ed.2d 58 (1974). Uffelman also claims that "the trier of fact could produce unfair inferences from misleading, confusing and unrelated factual and legal allegations against . . . Slawik and . . . Capano" with which "Uffelman would be associated." This contention does not suffice under Rule 14 because the possibility of embarrassment in participating in a joint trial which may result in "guilt by association" does not afford a ground for severance of one defendant's trial from that of his co-conspirators or from that of his co-defendants where Counts 1, 2 and 3 charge the defendants with participating in a series of acts and transactions constituting the offenses charged. *United States v. Wolfson,* 294 F.Supp. 267, 275–276 (D.Del.1968), *aff'd,* 454 F.2d 60 (C.A.3, 1972), *cert. denied,* 406 U.S. 924, 92 S.Ct. 1792, 32 L.Ed.2d 124 (1972).

**46.** Slawik's Rule 14 motion requested severance of Counts 1–6, 7–9, 10–11 and 12–13 (Docket Item 23, Docket Item 24 at 41–42, 47), while Rappa's "Motion to Sever" (Docket Item 13) requested severance of Counts 1–3 or Counts 1–6 from the other counts. See *infra* at 216 for disposition of Slawik's Rule 14 motion.

Therefore, the Court will deny any additional severances based on Capano's or Uffelman's Rule 14 motions.[47]

4. *Slawik's Motion pursuant to Rule 14 for severance of Counts 7, 8 and 9 from Counts 12 and 13.*

■ Slawik argues that even though Counts 7, 8, 9, 12 and 13 may be joined for trial under Rule 8(a), a severance of Counts 7, 8 and 9 from Counts 12 and 13 should be granted under Rule 14 in order to avoid possible prejudice. However, the Court is unconvinced that trying Slawik's perjury counts (7, 8 and 9) with Counts 12 and 13 charging him with subornation of perjury and obstructing justice as related to Petrillo would be so prejudicial as to require this Court, in its discretion, to sever. First, the factual details are not so complicated or extensive that the jury will become confused. Second, consolidating these counts in one trial, which are so similar in ultimate purpose, will not tend to arouse irrational jury hostility. Finally, the jury should be able to segregate the evidence as to each count and decide the issue upon proper jury instructions. *United States v. Weber, supra* at 332. Thus, Slawik's Rule 14 motion to sever will be denied.

An order will be entered in accordance with this opinion.

## ON MOTIONS TO SUPPRESS

The defendants in this criminal action are charged with one or more criminal offenses involving violations of the federal conspiracy statute, 18 U.S.C. § 371; the Travel Act, 18 U.S.C. § 1952(a)(3); influencing a witness, 18 U.S.C. § 1503; obstruction of a criminal investigation, 18 U.S.C. § 1510; subornation of perjury, 18 U.S.C. § 1622; and false declarations before the grand jury, 18 U.S.C. § 1623. During the discovery stage of this case, the defendants moved to require the government, pursuant to 18 U.S.C. § 3504(a), to affirm or deny that the defendants' conversations were unlawfully intercepted and recorded. In response, the government filed an affidavit which denied any electronic surveillance of the defendants "with the exception of a consensual monitoring of conversations between the defendants and Bayard Austin" as authorized by 18 U.S.C. § 2511(2)(c). Thus, the Court ordered an evidentiary suppression hearing to be held, pursuant to Rule 41(f), F.R. Cr.P., on the limited issue of whether Austin gave prior and voluntary consent to the electronic interception and recording of his telephonic and personal conversations with the defendants.

Such a hearing was held on January 14, 15 and 20, 1976. After carefully considering and weighing the testimony of the witnesses, their creditability and the documentary evidence adduced at the hearing,[1] the Court finds the salient facts to be as follows:

On August 7, 1974, Special Agent David E. Faulkner ("Agent Faulkner") of the Wilmington, Delaware FBI office, who was assisting in an investigation being conducted by the grand jury of this district, and Special Agent Donald M. Johnson ("Agent Johnson") of the Orlando, Florida FBI office called upon Bayard Austin ("Austin") at his home in Orlando, Florida for the purpose of obtaining his cooperation as a possible witness. Austin had been a long-time friend of the defendants and had been closely associated, at least, with Slawik and Capano in various activities in the past. The two FBI agents upon identifying themselves and being admitted into Austin's home, informed Austin that they were making an investigation of the defendants for the Wilmington

---

47. In view of the Court's disposition of the above motions, it is unnecessary to rule on Capano's and Slawik's motions to dismiss Count 1 of the indictment or (alternatively) to compel the government to elect between Counts 1 and 4. (Docket Items 23 and 5, respectively).

1. The Court also considered the letter memoranda submitted by the parties. (Docket Items 83, 84 and 87).

grand jury, asked him whether he would cooperate by providing answers to a number of questions concerning the activities of the defendants, and whether he would appear as a grand jury witness. Austin said that he did not want to appear before the grand jury, that the agents would have to extradite him to Delaware, and that if he appeared before the grand jury, he would take the Fifth Amendment. Agent Faulkner then advised Austin that he had a subpoena for his appearance before the grand jury, and, because possible federal offenses were being investigated, extradition proceedings were unnecessary. Austin had been aware of the grand jury investigation from reading newspaper accounts. Austin asked for time to think about the request that he give a statement and cooperate with the agents in the investigation. The following day, August 8, the FBI agents returned to Austin's home. Austin, who had discussed the matter at length with his wife in the meantime, informed the agents that he would talk and cooperate if he were assured of immunity, that he was afraid of being prosecuted, of going to jail, and becoming the "fall guy" in the investigation underway.

Shortly before Agent Faulkner left for Orlando, he and Special Agent James Snyder, the case agent in charge of the investigation, and Assistant United States Attorney David Hooper had generally discussed Faulkner's visit and anticipated that Austin might request immunity in exchange for his cooperation. When Agent Faulkner advised Hooper by phone on August 7 of his first contact with Austin on that day and that Austin might request immunity, Hooper in-

structed Agent Faulkner that he was authorized to grant Austin immunity from prosecution by federal authorities for his involvement in any activities which he disclosed in his interviews with the agents.

On August 8, 1974, after Austin said he would talk to the agents if granted immunity, Agent Faulkner advised Austin that he would not be prosecuted by the United States Attorney for any activities he disclosed during the course of his interviews and otherwise cooperated fully in the investigation by telling the truth and revealing all he knew about any phase of the matters under investigation.[2] Upon receiving this assurance, Austin during the course of two extended sessions on August 8 and 9, 1974, answered all the questions which the FBI agents asked him. On August 10, Austin went to the Orlando FBI office, and his statements given over the preceding two days were reduced to writing, verified and signed by Austin.

On August 10, 1974, Austin asked Agent Faulkner whether the latter could arrange to install a recording device on his home telephone because Austin wanted anything said by the defendants down in "black and white." Agent Faulkner said he would check into the matter and get back to Austin. In the same conversation Agent Faulkner asked Austin whether he would be willing to wear a body transmitter and recording device in the event Austin ever had a personal meeting with any of the defendants. Austin immediately agreed to this provided that he was given FBI protection while he was wearing the body device.

Between August 10 and October 8, 1974 Austin was frequently in touch by

2. At the time immunity was granted, federal authorities were unaware of any income tax problem which Austin had. It later turned out, as Austin testified, that while he was working for a company in which Capano had an interest, he was paid $150 per week by check and an additional $150 in cash as "under-the-table" earnings from the same source. Austin further testified that, when he asked Slawik about reporting the $150 cash payments for income tax purposes, he was told by Slawik not to report the cash payments as Capano was not reporting it in Capano's records as Austin's earnings. As a result, Austin did not file a 1973 federal income tax return because he was afraid of being prosecuted for filing a false return. When the government later learned of this problem, Austin filed a late return which disclosed all his earnings and was also granted immunity from federal prosecution for filing the late federal tax return. (Docket Items 78 and 81).

telephone with Agent Johnson in Orlando. On September 23, 1974 Austin received a telephone call from one of the defendants the sense of which made him feel threatened. Austin again asked for a recording device to be installed on his home phone. On October 8, 1974 Agent Faulkner returned to Orlando and arranged to have an expert from the Tampa FBI office attach a recorder to Austin's home telephone. This was done on October 9, 1974 and Austin gave a handwritten note to Agent Faulkner which read (GX 1):

"10/9/74

I, Bayard Austin, hereby authorize Special Agents of the FBI to record telephone calls made by me on this date."

s/ Bayard Austin

Witness: David E. Faulkner, S.A. FBI
10/9/74

James J Files, S.A. FBI
10/9/74"

Austin and his wife were also given instructions on the operation of the recording device.[3] Shortly after the device was installed, Austin called Slawik and in substance informed him that FBI agents had been to see him and were anxious for him to talk. On October 11, 1974, Austin gave a similar written authorization to the FBI to place a recording device on a public-pay telephone from which Austin placed a call to one or more of the defendants. (GX 2). Shortly thereafter Austin received a call from Slawik stating that Slawik, Uffelman and Capano were coming to Orlando to see him and asked him to meet them at the airport at 2 A.M. on October 14, 1974. Just after midnight of October 13, Austin went to Agent Faulkner's motel room where he was fitted with a body transmitting and recording device and was instructed on its operation and use. The body recording device was equipped with a switch-button which was placed in Austin's trouser pocket for turning it off and on. While the body

transmitting device also had a switch, it was positioned in the harness located in the center of Austin's back so that it could not be readily turned off by the wearer. So equipped, Austin proceeded to the airport, followed by FBI agents who were so positioned as to be able to receive any transmissions from the body transmitter. The defendants' conversations with Austin were thus transmitted and recorded from the airport to the motel where the defendants were staying. Also the conversations which took place in the motel room were likewise recorded and transmitted to the adjoining room occupied by Agent Johnson.

Again before the body device was placed on Austin, he signed a handwritten note which reads (GX 3):

"10/14/74

I, Bayard Austin, hereby authorize David E. Faulkner of the FBI to place upon my person a recording device for the purpose of recording conversations between myself, Mario Capano, Mel Slawik, and Bruce Uffelman, on this date.

s/ Bayard Austin"

While Congress, as a general rule, has made the interception and disclosure of wire and oral communications unlawful, 18 U.S.C. § 2511, and has prohibited the use in evidence of unlawfully intercepted communications, 18 U.S.C. § 2515, it has carved out an exception to these two statutory provisions by the language of § 2511(2)(c) which provides:

"(c) It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire or oral communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception."

The Supreme Court held in *United States v. Matlock*, 415 U.S. 164, 177, 94 S.Ct. 988, 996, 39 L.Ed.2d 242, 253 (1974) that the controlling burden of proof at a suppression hearing imposes no greater burden upon the government than proof

3. Austin was instructed to turn the recording device on for each incoming call and to turn it off if it did not involve a message from the

defendants. Austin was also told to turn the recorder on for any calls which he might make to the defendants.

by a preponderance of the evidence. See *Lego v. Twomey,* 404 U.S. 477, 488–489, 92 S.Ct. 619, 626–627, 30 L.Ed.2d 618, 626–628 (1972).

Thus, the narrow issue for determination is whether the preponderance of the evidence shows that Austin gave prior and voluntary consent to the electronic recording and transmission of his telephonic and personal conversations with the defendants from and after October 9, 1974.

First, the evidence is overwhelming that Austin, one of the parties to the conversations with the defendants, gave his *prior* consent verbally and in writing to the electronic interceptions and recordings.

Secondly, the evidence is clear that Austin voluntarily and freely consented to the electronic monitoring and surveillance. While it is true that Austin's consent came only after he had been promised immunity from federal prosecution, this does not render his consent per se involuntary. Indeed, when any defendant pleads guilty because he expects or hopes to obtain a more palatable sentence than he might otherwise face, his plea is not per se involuntary. The promise of immunity, like the promise of leniency with respect to a pending indictment, cannot be considered coercive in the absence of evidence that there were threats or promises of illegitimate action. To establish involuntariness, it would have to be shown that Austin's will was overcome by threats or improper inducement amounting to coercion or duress. *United States v. Silva,* 449 F.2d 145 (C.A. 1, 1971), *cert. denied* 405 U.S. 918, 92 S.Ct. 942, 30 L.Ed.2d 787 (1972). The record here shows no evidence of that character.

In *United States v. Jones,* 140 U.S. App.D.C. 70, 433 F.2d 1176, 1180 (1970), *cert. denied* 402 U.S. 950, 91 S.Ct. 1613, 29 L.Ed.2d 120 (1971), the Court held that the consent of a third-party to monitoring by federal agents of his telephone conversations with the defendant was not coerced or involuntary notwithstanding the fact that the third-party

himself was under investigation for perjury before a grand jury. To the same effect is the Third Circuit Court's decision in *United States v. Osser,* 483 F.2d 727 (C.A. 3, 1973), *cert. denied* 414 U.S. 1028, 94 S.Ct. 457, 38 L.Ed.2d 221 (1973). In that case in interpreting § 2511(2)(c), the Court held that consent given by a government informant to a warrantless recording of his conversation with the defendant was voluntary in the absence of any showing that the will of the informant was overborne by the government agents. In that case the consenting party testified that he did not feel pressured by the agents and that no implied threats had been made to him. The Court found that the consent given was voluntary even though an inference could be drawn from the testimony that the informant hoped by continuing his cooperation with the government that his forthcoming immunity would not be disturbed. However, the Court ruled that such hopes alone did not render the informant's consent involuntary stating "[o]ur inquiry on appeal is limited to whether the consent was voluntary and uncoerced, not whether the motivations for it were altruistic or self-seeking." *Osser,* supra, at 730. The Circuit Court cited with approval the language in *United States v. Zarkin,* 250 F.Supp. 728, 737 (D.D.C.1966) which spoke of a consenter's hope of leniency in these words:

"We can think of no time in which a party to a telephone conversation would permit the police to intercept that conversation when he, himself, would not seek something from the police in return, assuming he is of sound mind and knows the police are police. He might merely be seeking police protection from threatening phone calls. Or, he might be an undercover policeman who seeks his pay check. Or, indeed, he may be seeking leniency. However, so long as pressure is not initiated by the police for the purpose of overbearing the will of the party, this Court does not believe that the authorization given by the party is involuntary."

Other courts have upheld the voluntariness of consensual monitoring of conversation even though the consenting party was seeking something in return. *United States v. Franks*, 511 F.2d 25, 31 (C.A. 6, 1975), *cert. denied*, 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 693 (1975) (the fact that charges were dropped against the informant, that he was given protective custody, lodged in a nice apartment, provided with a living allowance and the use of a new Cadillac automobile were insufficient to vitiate consent); *United States v. Dowdy*, 479 F.2d 213, 229 (C.A. 4, 1973), *cert. denied*, 414 U.S. 823, 94 S.Ct. 124, 38 L.Ed.2d 56 (1973) (pressure of potential indictment and promise of immunity likewise were held insufficient); *Black v. United States*, 341 F.2d 583 (C.A. 9, 1965), *cert. denied*, 382 U.S. 854, 86 S.Ct. 105, 15 L.Ed.2d 92 (1965) ("special employee" status of and promise to arrestee to make his cooperation "known" to prosecutor's office was also held to be insufficient).

The creditable evidence in this case indicates that Austin would not cooperate or give any statements to the FBI investigating agents until he received an assurance of immunity. Thereafter, on August 10, 1974, the Court finds that it was Austin's idea and suggestion that a recording device be placed on his home telephone. He desired to have his conversations with the defendants in "black and white" because he and his wife were fearful that he might be made the "fall guy." There is absolutely no creditable evidence that Austin's verbal consents to the electronic monitoring of his telephone conversations were the result of any coercion, duress or pressure applied by the government. Having received immunity from federal prosecution and having given a full statement to the FBI, it was his own voluntary desire to have his telephone conversations recorded for his own protection.

As to the use of the body transmitting and recording device, the Court also finds that Austin freely consented to wear and use the devices during the time he was in personal conversation with the defendants in Orlando, Florida on October 14, 1974. When it was learned that the defendants were coming to see Austin in Florida, Agent Faulkner asked if he would be willing to use a body recorder. Austin replied that he would if he was assured of FBI protection while he was wearing the device in the defendants' company. Upon giving assurances of protection from physical violence, Austin readily gave his oral consent to wear the device and record his face-to-face conversations with the defendants. The Court again finds no evidence of coercion or duress or that Austin's will was overborne in any respect by the government agents.

The written consents signed by Austin (GX 1, 2 & 3) on October 9 and 11, 1974 authorizing the FBI to record his telephone calls from his home and from a pay-phone and the written consent signed on October 14, 1974 authorizing Agent Faulkner to place a recording device on his person for the purpose of recording his conversations with the defendants (GX 3) were nothing more than written confirmations of prior oral and voluntary consents theretofore given. In legal effect they were no more than "icing on the cake."

■ The defendant Rappa advances the argument that the government intercepted and recorded three conversations in which Rappa participated and of these only one (Austin to Slawik and Rappa on October 11, 1974) was a call "made by me [Austin]." Consequently Rappa argues that the two remaining calls were made *to* Austin (one from Slawik and Rappa *to* Austin on October 11, 1974 and the other from Rappa *to* Austin on October 12, 1974). Consequently, Rappa contends these two latter telephone calls exceed the written consent given by Austin and these recorded conversations must be suppressed. The Court finds no merit to this argument for two reasons. First, the evidence is undisputed that Austin's prior oral consents were unambiguous and voluntarily given and covered all telephone calls and personal conversations intercepted on his home phone, the pay-phone involved and the body recording

device which he wore on October 14. There was absolutely no evidence that the written consents were in any way intended to limit the parameters of the interceptions with the defendants. Second, while it is possible to construe the two written authorizations for placing a recording device on the phones in the restrictive manner suggested, the Court finds this would be an unreasonable and strained interpretation in view of the fact that the written notes were drawn by laymen and the further fact that it was Austin's and Austin's wife's voluntary decisions whether or not to record incoming telephone calls by activating the recorder switch and continue the recording. Had Austin understood his consent to be as limited as suggested by Rappa, he would have deactivated the recording device when the two telephone calls were received from Rappa and Slawik on October 11 and 12, 1974. See *United States v. Bonanno*, 487 F.2d 654, 658–9 (C.A. 2, 1973).

Accordingly, the Court concludes that a preponderance of the evidence[4] adduced at the suppression hearing proves that Austin gave his prior and voluntary consent to the electronic interceptions and recordings of his telephonic and face-to-face conversations with the defendants and for this reason defendants' motions to suppress such evidence will be denied.

The above shall constitute the findings of fact and conclusions of law.

---

**4.** While the defendants, relying upon *United States v. Baynes*, 400 F.Supp. 285, 294 (E.D. Pa.1975) have incorrectly argued that the voluntariness of consent to electronic interceptions must be proved by a higher standard of proof than by a preponderance of the evidence, viz. "by clear and convincing evidence," it is the Court's opinion that even this stricter standard of proof has been met in this case.